MARGARET M. BERWICK et al., Appellants, v STATE OF NEW YORK, Respondent. (Claim No. 1.)

In the Matter of SEBASTIAN T. PASCALE, Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 2.)

CONSTANT BISHOP, Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 3.)

EDWARD H. ROGERS, JR., Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 4.)

EDWARD H. ROGERS, JR., Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 5.)

NORMAN B. DIX, Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 6.)

Second Department, February 25, 1985

## APPEARANCES OF COUNSEL

*Joseph Lite* for appellants.

*Robert Abrams, Attorney-General* (*Jeremiah Jochnowitz* and *Dennis Hurley* of counsel), for respondent.

## OPINION OF THE COURT

Per Curiam.

As in the recently decided case of *Chase Manhattan Bank v State of New York* (103 AD2d 211), the central issue on this appeal is the proper valuation of property classified as wetlands taken in condemnation, where the claim is made that the wetlands restrictions are, themselves, confiscatory.

On October 26, 1979, the State of New York appropriated several parcels of land for conservation purposes pursuant to ECL 3-0305. The parcels, designated as Moneybogue Bay Marsh or Tidal Wetlands, are located in the Village of Westhampton Beach, Town of Southampton, Suffolk County. All front on either Moneybogue Bay or Quantuck Channel, and are vacant and unimproved. We are here concerned with nine of these parcels, owned by six separate claimants or groups of claimants.

The Berwick property consists of 5.4276 acres and has frontage on the west side of Library Avenue and on Moneybogue Bay. It has an elevation above mean sea level of 5.6 feet at Library Avenue and then slopes down to the bay, averaging 1.4 feet over the remainder of the parcel. The Dix property, consisting of two parcels on Berwick's southeasterly boundary, consists of 5.50 acres, with frontage on Library Avenue and Moneybogue Bay. Dix is the only case of a partial taking. The taking encompasses a narrow strip at one end of the property and a wider piece at the opposite end, for a total taking of 2.5998 acres. The remainder contains two dredged channels and a marina. The Berwick and Dix parcels are unique in that they are the only properties in the village to enjoy "Facility District 3" (F3) zoning, which permits marine usage, such as boat yards, and, by special exception, apartment houses.

The other parcels taken enjoy "Residential District 1" (R1) one-acre single-family residence zoning and front on Quantuck Channel at their southerly boundaries. The Pascale property, consisting of 19.7965 acres, also has frontage along the west side of Beach Lane. However, the Bishop property, 7.1468 acres, and the various noncontiguous "Rogers" parcels of 2.1712 acres (parcel No. 23.5), 2.4866 acres (parcels Nos. 23.7A and 23.7B), and 3.8967 acres (parcel No. 23.7C), respectively, located to the west of the Pascale property, are landlocked and have access only via a one-rod right-of-way to Beach Lane (see map appended to this opinion).

All of the above claims were tried together, claimants being represented by the same attorney and retaining the same appraiser and engineer while the State also retained one appraiser

who used the same comparable sales throughout. As in *Chase Manhattan Bank v State of New York* (*supra*), the parties posited diametrically opposed views as to the properties' highest and best use and, hence, their value on the day of taking. Claimants' appraiser valued the properties in accordance with their residential zoning (single-family or condominium apartment units, as the case may be), while the State's appraiser believed that their highest and best use was recreational and assigned only nominal values, i.e.:

|  | Claimants' Values | State's Values |
|---|---|---|
| Berwick | $858,000 | $ 5,400 |
| Pascale | $372,300 | $19,800 |
| Bishop | $150,000 | $ 7,100 |
| Rogers (parcel No. 23.5) | $ 66,000 | $ 2,400 |
| Rogers (parcels Nos. 23.7A, 7B and 7C) | $138,800 | $ 6,400 |
| Dix | $421,000 | $ 2,800 |

The enormous difference in proffered market values is attributable primarily to the parties' differing views on the economic feasibility of residential development and only secondarily to their differing views on the effect of the Tidal Wetlands Act (ECL, art 25). As to the latter, and assuming that residential development was economically feasible, claimants asserted that they were entitled to compensation for the loss of their right to challenge any permit denial pursuant to the Act as confiscatory (*see,* ECL 25-0404). Although claimants had never, in fact, sought a permit for development prior to the taking, they contended, in effect, that their properties had to be valued as if a finding of confiscation had already been made. The State, on the other hand, asserted that the market value of the properties on the day of taking would be nominal even if development were economically feasible because of the need to successfully surmount the long drawn out process of acquiring legal permission from State and local environmental authorities and the local zoning authority to develop these wetlands properties.

The Court of Claims found that the highest and best use of the properties was recreational, agreeing with the opinion of the State's appraiser that residential development was not economically feasible. It also stated its view that "any proposed residential development would encounter serious difficulties in being approved under local and State tidal wetlands regulations * * * [which] difficulties, like the need for zoning changes, reduce the desirability of property when other land is available with the

correct zoning". The court declined, however, to accept the $1,000 or $1,100 per acre recreational value ascribed to the properties by the State's appraiser. Rather, it found a per acre value of $3,000 by making further upward adjustments to the State's comparable sales for time, size and access.

On appeal, claimants argue that the Court of Claims finding as to the effect of the Tidal Wetlands Act is erroneous in that the properties had to be valued without regard to the Act if they had a reasonable economic use; and that the court erred in finding that zoning changes were required before the properties could be residentially developed. As to the effect of the Tidal Wetlands Act, we reiterate and expand upon what we recently stated in *Chase Manhattan Bank v State of New York* (103 AD2d 211, *supra*). Property taken in condemnation must be valued as legally restricted in use by all zoning and environmental regulations in effect on the date of taking. If a claimant believes that application of the Tidal Wetlands Act unconstitutionally deprives him of any reasonable economic return on his property, he may challenge its validity in the condemnation proceeding by demonstrating that no permit would have issued for any economically productive use and that application of the Act, coupled with the denial of a permit, destroyed the property's economic value. However, the law accords no retroactive effect to an evidentiary showing that claimant would probably have succeeded in securing a judicial declaration of unconstitutionality had he challenged the denial of a permit in a CPLR article 78 proceeding brought pursuant to ECL 25-0404. Rather, the law follows the realities of the marketplace, which are that a knowledgeable buyer would adjust his purchase price to offset the cost in time and money of applying for a permit and challenging its denial in court as confiscatory. Certainly, a knowledgeable buyer would not pay claimants the full unrestricted residential values of their properties on the day of taking, when the wetlands restrictions were still legally in effect. He would pay only the value of the property as so restricted, plus some increment representing its enhanced value at such future time when he is successful in nullifying the wetlands restrictions in court. Thus, in this sense, the Court of Claims did not err in its statement that difficulties in securing approval for residential development under local and State tidal wetlands regulations would reduce the desirability of these properties in the marketplace. That claimants might eventually have secured a judicial declaration of confiscation, compelling the State to compensate them for their loss if a permit was denied, simply cannot be translated

into a market value for immediate residential use on the date of taking.[1]

As respects any statement by the Court of Claims on the properties' zoning, claimants clearly misinterpret the court's holding. It did not find that zoning changes were necessary for residential development of the properties. The depressing effect upon property values of the need for zoning changes was mentioned merely as a well-settled analogy to the similarly depressing effect of the need for approvals from environmental authorities. However, it should be noted, with respect to the Berwick and Dix parcels, that apartment houses or town house condominiums are not permitted as of right in an F3 zoning district, but only by special exception. While they are still permitted uses, approval, with or without conditions, might come only after a long and arduous process, including public hearings (see, Matter of North Shore Steak House v Board of Appeals, 30 NY2d 238, 243-244).

We turn now to the really critical issue in this case, namely, whether or not residential development of claimants' properties would have been economically feasible. If so, the market value of the properties for residential use, without regard to the restrictions of the Tidal Wetlands Act, would probably be high enough to make out a case of confiscation and entitle claimants to an incremental award over and above the properties' restricted recreational market value.

It is undisputed that the Village of Westhampton Beach, an extremely popular resort-oriented recreation community, has been experiencing a phenomenal rate of growth, double the county rate and one third greater than the Town of Southampton as a whole. The strong demand for residential property has

---

1. The record is unclear as to the continuing effect upon these properties of the Village of Westhampton Beach Flood Control and Wetlands Preservation Ordinance, promulgated July 2, 1973. That ordinance was apparently proposed to preserve local wetlands pending the effective date of the State Tidal Wetlands Act. However, the ordinance, itself, contained no expiration date, and no evidence of its repeal was introduced. If, as the State claimed, the village wetlands ordinance was still in effect on the date of vesting, it would, as a practical matter, constitute another legal hurdle which would have to be surmounted before residential development could begin and, by the same token, another depressant upon the properties' market value. Conversely, if, as claimants argued, the village ordinance was no longer in effect on such date, claimants' case would be no stronger. There was also some question as to the continued existence of a village moratorium enacted in 1971 or 1972 pending a sewer feasibility study upon the construction of multiple dwellings. Although, again, no evidence of its repeal was found, it appears the State later abandoned any argument that it was still in effect on the date of vesting.

resulted in steadily increasing land values and the construction of new homes which are above average in style, price and quality, particularly along Dune Road on the barrier beach. Though further removed from the Quantuck Channel-Dune Road area than the other properties at issue, potentially the most valuable properties taken are Berwick and Dix because of their high density F3-apartment-house zoning. These parcels are located closer to the central retail district of the village and are near two other apartment complexes. Immediately adjacent are two marinas, one public and one private. Claimants' engineer, David P. Van Weele, prepared yield maps for the properties: 78 apartment or condominium units on the almost 5.5-acre Berwick parcel, and 46 units on the approximately 2.6-acre Dix parcels (by a permitted transfer of density, the unit yield permitted on each of the two Dix parcels taken could be combined and physically built on the larger parcel). Van Weele estimated development costs for Berwick at $163,322.50, including $77,512.50 for fill and $48,750 for a sea wall; and for Dix at $123,055.56. Claimants' appraiser, Charles A. Rogers, using the market data approach and four comparable sales of vacant parcels zoned for town-house use, valued Berwick at $11,000 per unit, for a total value of $858,000, and Dix at $13,500 per unit, for a total value of $421,000 (after deducting the value of the remainder not taken). The State's appraiser, John H. Schwartz, estimated somewhat greater development costs for fill and bulk-heading of the Berwick parcel (i.e., $188,100), and did not estimate such costs for the Dix parcel. However, Schwartz also believed that a sewage treatment plant, at a cost of $120,000, would be necessary for both parcels. Asserting in his appraisal report that developers can typically afford to pay between $3,500 and $4,000 per apartment unit for land, Schwartz concluded in his report, and stated on the stand at the trial, that high development costs made residential development economically unfeasible.

■ Although the question is not entirely free from doubt in the case of the Dix property, we hold that the Court of Claims erred in finding that residential development of the Berwick and Dix properties was not economically feasible. As respects development costs, the parties differed little except as to the need for a sewage treatment plant. Claimants took the position that no such plant was required under the Suffolk County Department of Health Standards for Sewage and Waste Disposal Systems where, as here, the design flow of the planned town house units did not exceed 30,000 gallons per day. The State's appraiser premised his opinion that a treatment plant would be necessary

upon conversations with village and county officials. The substance of these conversations as to Berwick was not revealed; the reason for a plant in Dix' case was said to be a health department requirement of a 150-foot setback of septic tanks from tidal wetlands. We note that under the aforementioned standards, the Suffolk County Commissioner of Health has power both to impose more stringent requirements and to grant a variance in any particular case.

Even assuming the necessity of a sewage treatment plant for the proposed Berwick and Dix condominium units, the State's appraiser's conclusion that development costs would thereby become prohibitive is unsupported in the record. The conclusory statement in his appraisal report that developers can typically afford to pay no more than $4,000 per apartment unit in land costs is totally without foundation and belied by claimants' comparable sales, which range in price per unit from approximately $8,100 to $22,000, unadjusted. When we also consider the strong demand for residential property in the Village of Westhampton Beach, the high prices being paid therefor and the premium high density zoning at issue, all conceded by the State, it strains credulity to believe that development of these properties would not have been economically feasible. Rather, we believe that, but for the strictures of the Tidal Wetlands Act, development would have been economically feasible and that the highest and best use of the Berwick and Dix properties was therefore residential, not recreational.

The remaining properties at issue are zoned R1 for one-acre single-family residences, and all have frontage on the northerly boundary of Quantuck Channel. The largest property is the almost 19.8-acre Pascale parcel, which also has frontage along the westerly side of Beach Lane. Claimants' engineer prepared a yield map showing a 16-plot subdivision and estimated development costs at $310,710.40. Claimants' appraiser valued the Pascale property at $19,000 per acre using the market data approach. The State's appraiser estimated development costs for a 16-plot residential subdivision at $638,500 — double the amount put forth by claimants. Although he conceded that there was no legal necessity therefor, and that he had no engineering survey for support, the State's appraiser proposed to place an average of six feet of fill over the entire 19.8 acres and to bulkhead the entire canal frontage plus 200 feet of the western boundary. Claimants' engineer had testified that only partial fill was necessary — covering those areas to be used for roads, foundations and septic systems. Finally, the State's appraiser asserted that the highest and best use of the Pascale property

was recreational and assigned it a market value of $1,000 per acre, for a total of $19,800, notwithstanding the witness' concession that it was at least economically feasible to develop one building plot and that the selling price of plots in Westhampton Beach ranged from $45,000 to $200,000, depending on the location.

In our view, the Court of Claims went contrary to the weight of the evidence when it found residential development of the Pascale property to be economically unfeasible. The development costs proffered by claimants may be somewhat conservative but are supported, on this record, by the testimony of an engineer with prior experience in developing property of a similar nature. In addition, claimants introduced into evidence, as a visual aid to the court, photographs depicting the construction of homes on plots in the surrounding area employing the partial fill method. The huge development costs proffered by the State, on the other hand, may fairly be characterized as totally arbitrary. The State's appraiser simply estimated the amount of fill necessary for a septic system and applied that across the entire property, presuming that such level would have to be maintained throughout. Total filling would also then beget expensive bulkheading. Unlike the claimants, the State had neither an engineering survey of the property, test borings, nor land use regulations to support its thesis. The failure of the State to buttress its position on the need for total filling and bulkheading with engineering testimony thus renders its conclusion entirely unconvincing.

Immediately to the west of Pascale are the five remaining parcels at issue, owned by three separate claimants (Bishop, Rogers, and Rogers individually and as agent). These have southerly frontage on Quantuck Channel and are landlocked except for a right of access over a one-rod (16.5 feet) right-of-way at their northerly boundary, running westward from Beach Lane south of Fanning Drive. Perhaps a third of each parcel, at its southerly end, consists of a dredge spoil pile, presumably placed there when the channel was excavated. The remainder is low marshland. The largest such parcel is Bishop, being about 7.1 acres and located about 730 feet west of Beach Lane. Claimants' engineer prepared a yield map of four one-acre plots and estimated development costs of approximately $60,000, comprising mainly the costs of partial fill and paving. Claimants' appraiser assigned the property a market value of $21,000 per acre or $150,000 for the total parcel. The State's appraiser estimated development costs at $256,315, which would include filling the entire property and bulkheading, and believed that

additional costs would be incurred because the northern two thirds or so of the parcel did not comply with county health and sewerage requirements. Alternatively, the State's appraiser considered development of two building plots on the 2.35-acre dredge spoil portion of the parcel, indicating that the New York State Department of Environmental Conservation generally approved single-family development on such spoils if sewerage and other requirements could be met. However, he concluded that development costs of approximately $110,000, including a pedestrian walkway of approximately 1,150 linear feet, made this alternative plan as economically unfeasible as the four-plot plan.

The Rogers parcels are four in number. (One is owned by Rogers, individually, and three are owned by Rogers and others.) Parcel No. 23.5 is the westernmost property at issue, being approximately 1,145 feet west of Beach Lane. Comprising approximately 2.2 acres but only about 80 feet in width, claimants' engineer estimated development costs at approximately $9,000 for a single building plot, while the State's appraiser estimated them at $120,175. As in the case of Bishop and the other Rogers parcels, the State's appraiser proposed development of the southern dredge spoil portion of the parcel and his costs assumed that no other parcel on the Quantuck Channel would be developed, so that the cost of a temporary roadway (for construction work) and a permanent pedestrian walkway running the entire length from parcel No. 23.5 to Beach Lane, would have been borne by the owner of said parcel. Claimants' engineer, on the other hand, proposed to develop a plot at the northern end of the parcel, near the right-of-way, and would not have built a temporary roadway or a permanent pedestrian walkway. Rather, he proposed paving a 15-foot-wide portion of the right-of-way all the way to Beach Lane. The cost of the access road improvements to the east of the subject parcel was, however, omitted from his development cost estimate on the theory that it would be borne, respectively, by each abutting parcel to the east. Claimants' appraiser valued parcel No. 23.5 at $66,000 for residential use; the State's appraiser valued it at $2,400 for recreational use.

The Rogers parcels Nos. 23.7A and 23.7B, contiguous to each other and therefore treated as one parcel, are located approximately 975 feet west of Beach Lane and comprise approximately 2.49 acres, with a width of only between 83 and 92 feet. Claimants proposed the development of one building plot, with development costs of about $18,000, while the State urged that development costs would be about $105,000. Parcel No. 23.7C,

located approximately 498 feet west of Beach Lane and consisting of about 3.9 acres, was seen by claimants as yielding three building plots. Claimants' engineer estimated development costs at $55,643.23. The State's appraiser, believing that sewage setback requirements limited development to one building plot, on the dredge spoil portion, estimated development costs at $74,535. Claimants valued parcels Nos. 23.7A and 23.7B at $57,000, and parcel No. 23.7C at $81,800. The State valued these parcels at $1,000 per acre for recreational use, for a total of $6,400.

■ The question of the economic feasibility of residential development of the Bishop and Rogers properties is a thorny one. Would these long and narrow interior marshland parcels, landlocked but for a one-rod right-of-way to Beach Lane, nevertheless have shared in the development boom in the Village of Westhampton Beach at the time of taking but for the restrictions of the Tidal Wetlands Act? In the end, we believe the answer is no, or, at least, that claimants failed to carry their burden of proof on this issue.

The underlying premise of the State's argument that development of the Bishop and Rogers parcels was not economically feasible was the county's requirement that septic tanks be set back 150 feet from tidal wetlands. Since each parcel at issue here is less than 300 feet in width, it could never meet that requirement, treated in isolation, because the adjoining parcels would remain tidal wetlands. As a result, development would be limited to the filled-in dredge spoil pile running across the southern end of the subject properties. As indicated by the State's appraiser, the costs of such development, which would apparently constitute a permissible use under the Tidal Wetlands Act, would be prohibitive if the Tidal Wetlands Act was fully applicable and claimants did not share the cost of improvements common to all. Even if all these parcels could be treated as one and/or the setback regulation ignored and it is assumed all claimants would have sought to develop their properties at the same time, we find claimants' estimated costs and the development cost adjustment to their comparable sales to be unrealistically low.

We also note that, contrary to claimants' urging, the State's comparable sale "L-3" does not support their case. That sale involved 17 plus acres, 62% of which was tidal wetlands, which essentially encircles the subject properties on the north and west. More specifically, it fronts on Quantuck Channel on the south and Moneybogue Bay on the west; adjoins the Rogers

parcel No. 23.5 on the east; and then runs northeasterly, paralleling claimants' right-of-way and straddling Fanning Drive. (That portion of "L-3" fronting on Moneybogue Bay and most of it running south of Fanning Drive appears also to have been taken by the State but is not part of this proceeding.) According to the State's appraiser, the property was purchased in 1966 for $40,000 with hopes of development. In 1967, a subdivision map was filed. In 1968, one lot was sold for $10,000. In 1975, that same lot was resold for $23,500 and a house was built on the site. Another house was built at some point on a lot to the north. While it is true that these sales show a relatively large appreciation in land values, it is also true that these lots are not comparable to the Rogers and Bishop parcels. The lots are not dependent on a right-of-way for access, fronting instead on Fanning Drive; and, more important, are located on upland, not wetland. The interior wetland portion of sale "L-3", both south of Fanning Drive and fronting on Moneybogue Bay, where development costs would be much higher, was never developed.

Having determined, on the record before us, that residential development of the Berwick, Dix and Pascale properties, but not the Rogers and Bishop properties, was economically feasible, we turn now to the question of the properties' market value at the time of taking. The correct measure is the market value of the property as legally restricted in use by the Tidal Wetlands Act and any other pertinent environmental regulations in effect on the date of taking. Additionally, where a claimant has demonstrated that development of the property is economically feasible, and, in accordance with the evidentiary strictures of *Spears v Berle* (48 NY2d 254), that application of the wetlands regulations has destroyed the economic value of the parcel, or all but a bare residue of that value, he is entitled to an increment above the restricted value.

The State's appraiser valued most of the properties at $1,000 per acre. The Dix and Rogers parcel No. 23.5 were valued at $1,100 per acre. These values were premised upon use of the properties for recreational purposes only, development being effectively precluded by the Tidal Wetlands Act. (Claimants' appraised market values are irrelevant at this point since they totally ignore the effect of the restrictions of the Tidal Wetlands Act.) The Court of Claims found the State's values too low. Relying particularly upon one of the State's comparable sales ("L-6"), and making further upward adjustments for time and, in some cases, for size and access, the court concluded that the properties' true market value was $3,000 per acre.

■ We do not agree with claimants that differences in size, access and zoning among the subject parcels necessitates a different per acre market value for each. If the legal use of each is the same, that is, if each parcel must remain undeveloped and in its pristine state, the cited differences would appear to have little relevance. Hence, we accept the Court of Claims finding of a $3,000 per acre market value for all of these parcels as accurately representing their market value, at the time of taking, as a result of regulation by the Tidal Wetlands Act.[2] In the case of the Rogers and Bishop parcels, the court's finding as to market value, as restricted by the Tidal Wetlands Act, is conclusive. This is because residential development was not economically feasible and, therefore, the wetlands' regulations could not possibly be confiscatory. However, in the case of the Berwick, Dix and Pascale parcels, we must go further since we find that claimants did establish that development was economically feasible and that a successful court challenge to application of the Tidal Wetlands Act as confiscatory was reasonably probable.

More particularly, it is clear from the record before us that the only use of the Berwick, Dix and Pascale properties which would be permitted under the Tidal Wetlands Act is a recreational one and that, as so restricted in use, the parcels' values are essentially nominal, being $3,000 an acre or $16,300 for Berwick, $7,800 for Dix and $59,400 for Pascale. As was also true in *Chase Manhattan Bank v State of New York* (103 AD2d 211, *supra*), this evidence was produced primarily by the State. On the premise that development was economically feasible, claimants proffered unrestricted market values of $858,000 for Berwick and $421,000 for Dix (apartment house zoning), and $19,000 per acre or approximately $375,000 for Pascale (one-acre zoning). Disagreeing with claimants' premise, the Court of Claims made no finding as to values without regard to the Tidal Wetlands Act's strictures. We find that claimants' unrestricted values, based upon a direct sales comparison (market data) approach, have substantial support in the record. Although a greater downward adjustment for "developability" might have been objectively warranted in considering the Pascale comparable sales (most of which appear to have been "on grade" properties) and, to a lesser extent, the Berwick and Dix comparable sales (many of which were also wetlands, including a former

---

2. We note that the State has abandoned its cross appeals from these condemnation awards, which cross appeals were premised upon the Court of Claims alleged unwarranted increase of the market values found by the State's appraiser.

duck farm in Southampton), we are persuaded that any such reduction would have been overcome by the obviously premium prices commanded by waterfront properties in Westhampton Beach. In the future, however, the State should be better prepared to counter a claimant's proof of "developability" with engineering testimony of its own.

We further find that a comparison of market values with and without regard to the developmental restrictions of the Tidal Wetlands Act demonstrates that application of the Act has effectively deprived these claimants of all financially rewarding uses of their property. Hence, we conclude that the Berwick, Dix and Pascale claimants have carried their burden of proving that a constitutional challenge to application of the Act as confiscatory would have, at least, a reasonable probability of success in court; and that these claimants are, therefore, additionally entitled to an incremental award, over and above the property's restricted market value, representing its enhanced value to a knowledgeable buyer in light of the reasonable probability of a successful constitutional court challenge.

Two additional points raised by claimants merit brief mention. First, it is argued that the Court of Claims erred in totally disregarding a prior sale of the Berwick property and that such sale was actually the best comparable for purposes of determining market value on the day of taking. The sale in question occurred in 1968, for a price of $162,500, and was concededly an arm's length transaction between Berwick and a real estate syndicate. In 1971, the purchasers' application for a variance to increase the allowable density of cooperative or condominium units was denied. Around the same time, the Village of Westhampton Beach enacted a moratorium upon the construction of multiple dwellings pending a sewer feasibility study. Thereafter, both the State and village enacted legislation to preserve tidal wetlands. The syndicate defaulted on its purchase-money mortgage to Berwick and, in 1976, the latter foreclosed and took the property back. While it is generally true that the price of a prior arm's length sale of the property at issue is, prima facie, an excellent indicator of its value at that time (*see, Matter of Woolworth Co. v Tax Commn.*, 20 NY2d 561, 565), this 1968 sale is of little value at bar in determining the market value of the property in 1979, the time of taking. It has no bearing on the market value of the property as restricted by the Tidal Wetlands Act since that Act did not exist at the time of the sale; and we do not believe that claimant Berwick is offering such sale as indicating the property's unrestricted value in 1979.

Nor would it appear to have much relevance in connection with the incremental award to be made upon remand. Rather, the real value of this pre-wetlands legislation sale seems to lie in independently corroborating our conclusion that the effect of this legislation was to destroy the economic value of the Berwick parcel, its value being reduced from $162,500 in 1968 to only $16,300 in 1979.

■ Finally, claimants argue that the Court of Claims erred in failing to accept into evidence subdivision maps of certain properties in East Islip and West Islip. In particular, claimants sought to introduce topographic maps of two subdivisions, upon which their engineer had worked, which were allegedly very similar to the Pascale parcel. Claimants' purpose was to show that property of similar topographical characteristics had been successfully developed and hence that it was economically feasible to develop the Pascale parcel. The court excluded the evidence on the ground that these subdivisions were located too far away from Westhampton Beach. In our view, the court should have allowed the topographic maps into evidence on the issue of the economic feasibility of development. Since the material was not offered as direct evidence of market value via comparable sales, distant location would not be a disability. To the extent that these maps could aid the court in determining what would be necessary physically to develop Pascale's tidal wetland parcel and what the cost might be, they would certainly be relevant and helpful.

The judgments in favor of claimants Rogers and Bishop should be affirmed, without costs or disbursements. The judgments in favor of claimants Berwick, Dix and Pascale should be reversed, on the law and the facts, without costs or disbursements, and the matter should be remitted to the Court of Claims for a new hearing limited solely to the amount to be awarded these claimants on the basis of the increment above the recreational value that a knowledgeable buyer would pay in light of the reasonable probability of a successful constitutional court challenge. Based upon the new evidence to be adduced and the recreational values already found by the trial court, the Court of Claims should make a new determination as to the proper award in condemnation. The residential value found by this court in its disposition of the constitutional issue may not become the basis for a valuation method which uses those residential values as a beginning point and discounts them because of the uncertainties and expenses of a constitutional challenge. It is the recreational value that is the beginning point to which there must be added the premium which a willing buyer would pay in view of the

benefits of a reasonably probable removal of the wetlands' restrictions and the costs and uncertainties of constitutional challenge.

LAZER, J. P., GIBBONS, WEINSTEIN and NIEHOFF, JJ., concur.

Three judgments of the Court of Claims dated May 19, 1982 (claim No. 3), May 19, 1982 (claim No. 4) and June 14, 1982 (claim No. 5), respectively, affirmed, without costs or disbursements.

Three judgments of the Court of Claims dated May 20, 1982 (claim No. 1), June 14, 1982 (claim No. 2), and May 19, 1982 (claim No. 6), respectively, reversed, on the law and the facts, without costs or disbursements, and matters remitted to the Court of Claims for a new hearing limited solely to the amount to be awarded the claimants based on an increment above the recreational value that a knowledgeable buyer would pay in light of the reasonable probability of a successful constitutional challenge in court to applicable legislation restricting the use of tidal wetlands.

## APPENDIX