In the Matter of COUNTY OF SUFFOLK, Appellant. L. C. EQUITIES et al., Respondents.

Second Department, July 1, 1985

APPEARANCES OF COUNSEL

*David J. Gilmartin, County Attorney (John C. Bivona* of counsel), for appellant.

*Costigan, Hyman & Hyman, P. C.,* and *Koeppel, Sommer & Martone, P. C. (George B. Costigan, Jr., Harvey Zeichner* and *Michael R. Martone* of counsel), for respondents. (One brief filed.)

### OPINION OF THE COURT

Per Curiam.

Unlike the recent cases of *Chase Manhattan Bank v State of New York* (103 AD2d 211) and *Berwick v State of New York* (107 AD2d 79), which involved claims that certain wetlands restrictions were themselves confiscatory, the central issue on this wetlands condemnation appeal reflects a more typical valuation problem. Since the property here involved contains sufficient uplands, both sides agree that its highest and best use is as zoned (partly residential and partly business), and that development is both legally and economically feasible. Rather, the main issues dividing these parties are (1) under the market-data-comparable-sale approach, what is the proper adjustment, if any, for the existence of classified wetlands, and (2) what is the proper method of valuation for that portion of the property lying under the waters of a canal and a bay.

On October 9, 1974, the County of Suffolk appropriated several parcels of land in the Town of Brookhaven for park purposes pursuant to the Suffolk County Improvement Act. The land is located on the westerly side of William Floyd Parkway and fronts on the Great South Bay in Shirley, Long Island. The parcels here involved, designated 1A, 1B and 3 on the taking map, are irregular in shape, unimproved with one exception, and contain a total of 97.025 acres.

Parcel 1A contains 39.74 acres, of which approximately 42% is tidal wetlands, and is zoned Residence B, for single-family residences on lots having a minimum size of 15,000 square feet. Parcel 1B contains 40.365 acres and is split zoned: 14.87 acres, all upland, are zoned Residence B, 25.5 acres, of which approximately 20% are tidal wetlands, are zoned J Business 2. The business-zoned acreage contains a bulkheaded canal comprising approximately 6.5 acres of land under water. Parcel 3, contigu-

ous to the south of parcel 1B, consists of 16.924 acres of unzoned land under the bay.*

The parcels at issue were originally part of a much larger tract of land owned by Walter T. Shirley. In 1957, Shirley, or one of his corporations, dredged out and bulkheaded the canal located in parcel 1B, which was then residentially zoned. The purpose was to obtain fill for adjoining property, which was mostly wetlands, and to construct a marina. In 1959, one of Shirley's corporations, Mastic Acres, Inc., applied to the Brookhaven Town Board for a change of zone of a portion of parcel 1B to business use. A master plan outlining its development as a commercial marina, including approximately 1,200 docking slips for boats, was submitted along with the rezoning application. The Brookhaven Town Board granted the application subject to the filing of certain covenants and restrictions which required, *inter alia,* that no boats be stored or repaired in the open air and that the marina substantially comply with the master plan submitted. Thus, in accordance with Shirley's own plans, all boats had to be moored in the water. However, the marina was never completed, Shirley died and the property was eventually transferred to the claimants herein.

The parties' appraisers agreed that the highest and best use of the property was residential and commercial development in accordance with its existing zoning (*compare, Chase Manhattan Bank v State of New York, supra,* and *Berwick v State of New York, supra,* where the condemnor's appraisers took the position that the highest and best use of those properties was recreational and assigned them only nominal values). Hence, there is no claim that the wetlands regulations destroyed all but a bare residue of the property's economic value. However, the opinions of the parties' appraisers did diverge on another aspect of the valuation problem, namely, what adjustments to comparable sales, if any, should be made for the physical existence of tidal wetlands on the parcels at bar. The county's appraiser, Patrick A. Given, who considered both the physical problems of developing lowlands and the Tidal Wetlands Act (ECL art 25), giving more weight to the former, made rather large negative adjustments wherever the configuration or ratio of uplands to wetlands on comparable sale parcels was superior to that of the subject parcel, without regard to differences in actual yield.

* The parties disagree as to the exact amount of acreage contained in the business-zoned portion of parcel 1B and in parcel 3, the county positing approximately one more acre in the former and one acre less in the latter. Since the county makes no issue on appeal as to this discrepancy, we accept the figures proffered by claimants and found by Special Condemnation Term.

Claimants' appraiser, Charles A. Rogers, who believed that the Tidal Wetlands Act had no impact on valuation "by virtue of case law and * * * the fact that the property can be utilized completely disregarding the Wetland Act", made no distinction whatsoever between uplands and wetlands. The other major difference between the parties concerned the valuation of the land under water. The county's appraiser assigned such land the nominal value of $1, being of the view that the value of the 6.5 acres in the canal and the 16.924 acres in the bay had previously been transferred to the adjoining upland. Claimants' appraiser, on the other hand, valued the canal land as if it were not under water and the land under the bay at 50% of his per acre commercial upland value. As a result of these differences, the county's appraiser valued the total property appropriated at $904,500 on the date of taking, while claimants' appraiser valued it at $2,390,000.

Special Condemnation Term found that the value of the property on the taking date was $1,513,507. Relying exclusively upon two comparable sale parcels, one residentially zoned and the other commercially zoned, which parcels were used by both appraisers, the court made its own adjustments to arrive at per acre values, in particular rejecting the county's large downward adjustments for the greater percentage of wetlands present in the subject parcels. As respects the land under water, Special Condemnation Term disagreed with both appraisers and found that the canal land should be valued at 50%, and the land under the bay at 25% of the business-zoned upland, since the land under water was indispensable to development of the marina under the master plan. Special Condemnation Term also made an award for the depreciated value of the bulkheading and the cost of dredging.

On appeal, the county argues that Special Condemnation Term erred in holding that the Tidal Wetlands Act (ECL art 25) was not a significant factor in the valuation of the subject property. This court has previously held in the *Chase* case (*supra*) that property taken in condemnation must be valued as legally restricted in use by all zoning and environmental regulations in effect on the date of taking. Hence, as a general proposition of law, Special Condemnation Term was certainly wrong. However, in examining the evidence proffered by the parties, the impact of the wetlands regulations upon the market value of parcel 1A is not so clear. According to the county, residential development was feasible but legally restricted to the upland portion of the parcel (22 of 39 acres). Further, upland development within 300 feet of the wetlands boundary was subject to

regulation by the New York State Department of Environmental Conservation, which would have required a public hearing, and some debogging and fill might also have been required. Finally, the total yield would be significantly less than the maximum yield in this Residence B 15,000-square-foot-minimim-lot zone since, even with clustering and a transfer of wetland yield to the upland, the Town of Brookhaven was disinclined to allow lots smaller than 10,000 to 12,000 square feet. Claimants, on the other hand, totally ignored the wetland regulations and treated parcel 1A as if it were entirely upland acreage.

■ Both sides used four sales of residential acreage to arrive at the market value of parcel 1A on the day of taking. Two of the sales employed by the county's appraiser contained very substantial wetlands; those employed by claimants' appraiser were almost entirely uplands. The county's appraiser found a market value of $5,300 per acre, while claimants' appraiser found a market value of $13,750 per acre. Special Condemnation Term ultimately settled upon a value of $8,574.50 per acre for parcel 1A by making its own adjustments to the sole comparable sale parcel used by both appraisers. That property, known as the Coraci parcel, was located directly across William Floyd Parkway from the subject property and was once a part of Shirley's holdings. Consisting of 4.543 acres, this basically upland parcel sold in 1973 for $12,766 per acre. Claimants' appraiser made only one adjustment — for time. The county's appraiser adjusted for size, water frontage, topography and "wetlands area". The latter, a 70% negative adjustment, assertedly represented 80% of the difference in the percentage of wetlands contained in the subject property as opposed to the comparable, the premise being that wetlands have little more than minimal aesthetic value. Thus, in practical terms, the fact that parcel 1A consisted of 58% upland while the Coraci parcel consisted of 95% upland, without more, resulted, according to the county's appraiser, in an adjusted reduction in value of the Coraci comparable, from approximately $13,000 per acre to $4,000 per acre. Special Condemnation Term adjusted solely for size (-15%) and topography (-10%), arriving at a final value of $8,574.50 per acre. Although none of the parties has noticed, Special Condemnation Term made an arithmetical error here in favor of the county in the sum of $1,000 per acre in that a 25% adjustment would result in a per acre value of $9,574.50, not $8,574.50. In any event, we hold, on this record, that an additional 15% adjustment should have been made for the existence of a significant amount of wetlands on the subject property and

its effect upon developability. As urged by the county and never effectively disputed by claimants, the existence of protected wetlands ultimately make residential development more difficult and less rewarding than would be the case if the entire parcel were uplands. So viewed, the market value of parcel 1A is recalculated and found to be $7,659.60 per acre or a total of $304,392.50 for 39.74 acres.

On this appeal, the county does not challenge Special Condemnation Term's award of $8,574.50 per acre for the 14.87 acres of residentially zoned land in parcel 1B. That property was entirely uplands and, although the county's appraiser admittedly found it slightly more valuable than parcel 1A, claimants and Special Condemnation Term had treated the two parcels equally.

■ As previously noted, parcel 1B is split zoned. Zoned J Business 2 are 25.5 acres, of which approximately 20% are tidal wetlands and another 20% or so (actually 6.5 acres) is land underneath a bulkheaded canal. Both sides used four sales of commercial acreage to arrive at market value on the day of taking, claimants coming up with a value of $37,500 per acre and the county with a value of $22,500 per acre. One of these sales, 22 acres of commercially zoned, nonwaterfront land on William Floyd Parkway in Shirley, was employed by both appraisers. That property sold in 1975 for approximately $28,800 per acre. Claimants' appraiser made only one adjustment, +25% to represent the superior location of the subject. The county's appraiser made three adjustments: water frontage (+10%), zoning — restrictive covenant (-5%), and "wetlands area" (-28%). Special Condemnation Term accepted the county's analysis except for the relatively large negative adjustment for "wetlands area" and arrived at a market value of $30,280 for the commercially zoned portion of parcel 1B on the day of taking. Contrary to the case of the parcel 1A wetlands, we find that the county failed to establish that the existence of tidal wetlands on the commercial portion of parcel 1B requires a reduction in the market value found by the court. Both sides agreed that the highest and best use of the parcel was for a commercial marina and that open-air storage of boats was prohibited by the restrictive covenant. The county simply failed to prove that the existence of tidal wetlands on the parcel would inhibit this manner of commercial development or make it appreciably more expensive.

Valuation of the canal portion of parcel 1B, consisting of 6.5 acres of land under water, and the 16.924 acres of land under the

bay comprising parcel 3, presents a thornier question. Claimants' appraiser valued the canal in its predredged state, i.e., as if it were all flat dry land, put to business use. Thus, he made no distinction between the canal and the business-zoned upland, valuing them equally. Parcel 3 was valued by claimants' appraiser at 50% of the value of the commercially zoned upland on the theory that its use was limited to a berthing basin since it was always under water. The county's appraiser assigned the nominal value of $1 to both the canal land and parcel 3. He believed that the owner of the contiguous land did not have to own or lease the land under the water in order to use the water for marina purposes and that the true value of these parcels had already been transferred to the adjoining upland. In addition, both sides proffered proposed awards for the costs of dredging and bulkheading the canal, using the cost approach. Finding that the land under water was necessary as a docking area and thus was essential to the development of the marina, Special Condemnation Term rejected the county's view and valued the canal land at 50%, and the bay land at 25% of the value of the commercial upland.

On appeal, the county complains that claimants' appraiser's valuation of parcel 3 was based entirely on his own subjective judgment and not on any sale of comparable boat basins. While it is true that neither side could point to any comparable sales to determine value, it was not error for the court to look for guidance to the more subjective judgmental determinations of these expert witnesses. Just as the county's expert conceded some closeness in the analogy between a shopping center parking lot and a marina boat basin, we find that parcel 3 was necessary to the development of this particular marina as a berthing basin or docking area and that, therefore, it had much more than nominal value. Hence, Special Condemnation Term properly rejected the county's $1 valuation and adopted claimants' approach to value.

As to the canal land, the county argues that the award represents double if not triple recovery in that clamants are compensated first for digging the canal, via a dredging cost award, even though they have already received compensation for the fact that the dredge spoil deposits created valuable adjacent uplands; and then claimants are compensated for the finished canal on the basis of noncomparable upland sales. We find no such excessive recovery. Claimants have not been twice compensated for creating buildable upland since the dredging cost award is properly limited to the amount necessary to create a canal of a 5- to 6-foot navigable depth, not the 28-foot depth

actually dug to provide necessary dredge spoil for the adjoining land. Further, because of the commercial marina zoning and restrictions, the canal land has value over and above that normally transferred to adjacent parcels in the form of tangible dredge spoils or intangible water frontage incremental values. We also note that Special Condemnation Term's award of dredging and bulkheading costs is amply supported by the testimony of the parties' engineering experts, if not their appraisers, and is not seriously challenged on appeal.

■ Finally, the county urges that Special Condemnation Term erred when it excluded from evidence two letters, which allegedly constituted real estate listings by claimants at a price or value far below that asserted by them at trial. Had these letters been what they were represented to be, the county might have been correct, for evidence of the price at which an owner offered to sell is admissible, although not always relevant (*Sparkhill Realty Corp. v State of New York,* 238 App Div 656). Nonetheless, the letters at issue here were not properly qualified by the county as expressions of value by the claimants. Exhibit 13 was a March 1972 letter from claimants' attorney to a third party which did not even discuss price but only ownership and acreage. Exhibit 14 was a December 1971 letter from the listing broker to one of the owners of the property, Leslie Jonap, discussing an offer of sale to the Suffolk County Park Commissioner at "your listed price of $6,500 per acre gross". Special Condemnation Term denied these items admission into evidence on the ground the owner's offer and estimate of value might have been based on a distress situation. Other problems precluding admissibility were the absence of any evidence that Jonap actually set or authorized the $6,500 per acre price, and the county's failure to include this listing in its appraisal report if, as it appears, it was offered as proof of value (*see,* 22 NYCRR 678.1). On the other hand, it seems clear that even the county believed that the property was worth far more than the listing since its valuation was $904,500 as of the 1974 vesting date, as opposed to the 1971 listing for approximately $630,500.

The award for parcel 1A should be reduced from $8,574.50 per acre ($340,750 total) to $7,659.60 per acre ($304,392.50 total) and the judgment modified, on the law and the facts, by reducing the total award for the entire property from the principal sum of $1,513,507 to the principal sum of $1,477,149.50. As so modified, the judgment should be affirmed, without costs or disbursements.

LAZER, J. P., GIBBONS, THOMPSON and O'CONNOR, JJ., concur.

Resettled order and decree of the Supreme Court, Suffolk County, dated November 18, 1981, modified, on the law and the facts, by reducing the award to claimants from the principal sum of $1,513,507 to the principal sum of $1,477,149.50. As so modified, resettled order and decree affirmed, without costs or disbursements, and matter remitted to the Supreme Court, Suffolk County, for entry of an appropriate amended judgment.