[634 NYS2d 740]

In the Matter of JOSEPH F. GAZZA, Appellant, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Respondent.

Second Department, December 4, 1995

APPEARANCES OF COUNSEL

*Esseks, Hefter & Angel,* Riverhead *(Stephen R. Angel* and *John M. Wagner* of counsel), for appellant.

*Dennis C. Vacco, Attorney-General,* New York City *(Maria Semidei-Otero* and *Leslie Allen* of counsel), for respondent.

### OPINION OF THE COURT

FRIEDMANN, J.

On this appeal, we must determine whether a landowner who purchased property with the full knowledge that it had been designated protected tidal wetlands can claim that a regulatory taking occurred when he was denied a building permit for a residence. We conclude that where, as here, a landowner does not have a reasonable investment-backed expectation that he would be able to build a residence on his parcel, he cannot claim a regulatory taking when his application for a permit to allow the construction of a building is denied.

I

This is a proceeding pursuant to ECL 25-0404 to review the denial of a permit to allow the construction of a building to the petitioner, Joseph F. Gazza, by the respondent, the New York State Department of Environmental Conservation. The petitioner purchased the subject parcel for $100,000 on November 29, 1989. Of the purchase price, $90,000 was used to discharge a tax lien that had been placed on the property by the Internal Revenue Service (I.R.S.). The parcel is located on the north side of Dune Road in the Village of Quogue, Suffolk County. The northerly side of the parcel fronts on the Quogue Canal.

At the time of the petitioner's purchase, approximately 65% of the in-excess-of-47,000-square-foot parcel had been inventoried as tidal wetlands by the respondent *(see,* ECL 25-0101 *et seq.).* These wetlands had first been inventoried in or about 1977. Some amendments to the designated wetlands on the

parcel were made in 1981. The respondent's power to expand the inventoried wetlands on the subject parcel by the filing of an amended map was sustained by this Court (see, Matter of Thompson v Department of Envtl. Conservation, 132 AD2d 665, affg 130 Misc 2d 123).

Several months prior to the petitioner's purchase of the property, he submitted to the respondent an application to construct a single-family home on the parcel. As part of this application, the petitioner requested variances from the two setback requirements contained in the respondent's regulations. The first variance request was from the minimum 75-foot setback required between the tidal wetland boundary and the dwelling (see, 6 NYCRR 661.6 [a] [1]). The second variance request was from the 100-foot setback required between the tidal wetland boundary and the septic system (see, 6 NYCRR 661.6 [a] [2]).

The matter was heard by an Administrative Law Judge (hereinafter ALJ) who recommended that the application be denied. In her report, the ALJ concluded that: "A preponderance of the evidence indicates that the proposed Project would cause undue adverse impacts on the wetlands' value for marine food production, wildlife habitat, flood, hurricane, and storm control, absorption of silts and other organic material, and cleansing of the ecosystem * * * The proposed Project would eliminate one of the few remaining pristine and undeveloped wetlands in an otherwise developed area".

The ALJ therefore denied the application for a permit. However, the ALJ also recommended that at the petitioner's option, "since no party is in opposition, a permit for a dock, catwalk, and small parking lot may be issued".

The recommendation was adopted by the Commissioner of the Department of Environmental Conservation (hereinafter the DEC) on January 16, 1992. In a subsequent letter, the DEC, by one of its attorneys, informed the petitioner that it would permit the construction of a parking area, single catwalk, and single dock of 20 feet on the property. The DEC would also permit either the placement of a mobile home "with self contained septic" on the site or the placement of a 100-square-foot shed for storage and mechanical systems that could be used for the mooring of a single-family houseboat.

## II

### A

On or about February 10, 1992, the petitioner commenced the instant proceeding under ECL 25-0404, asserting that the respondent's denial of a building permit constituted a taking of his real property without compensation *(see,* ECL 25-0404).

At the hearing before the Supreme Court, the petitioner's appraiser, James R. McLauchlen, testified that assuming that a residence could be constructed thereon, the parcel was worth $396,000. McLauchlen used the direct sales comparison approach to derive this value. All of the 12 comparables that McLauchlen used were partially comprised of tidal wetlands. However, only two were comprised of from 65% to 70% tidal wetlands (i.e., as is the subject parcel).

No adjustment was made to any of the comparables to reflect the fact that a wetlands permit was required before there could be construction on the subject parcel. In other words, McLauchlen assumed that the subject parcel could be sold in the marketplace unencumbered by any wetland restriction. In McLauchlen's words, his "assignment was based upon the assumption that there would be a minimum house or the ability to have a minimum house constructed on the property".

In contrast, the respondent's appraiser, Patrick A. Given, . testified that at the time the petitioner purchased the parcel, it was worth approximately $80,000. One of the crucial assumptions made by the respondent's appraiser was that "a knowledgeable buyer would recognize that this property was not going to be readily buildable, that it would be speculative at best at that time". He therefore assumed that the highest and best use of the property would be for recreational use. It would be an attractive site for a houseboat or mobile home of some kind.

Mr. Given utilized the direct sales comparison approach, relying on four comparable sales which he believed were "similar to the subject [parcel] in that, number one * * * they were [not] readily buildable for a single family residence and [number two], they had a highest and best use similar to the subject [parcel], that is: For a recreational use * * * water access".

### B

At the hearing before the Supreme Court, the petitioner attempted to establish that it would be impossible for him to

construct a dock on the property because he would not be able to obtain the requisite permits from the local governmental entities. In this regard, Roy L. Haje, an "environmental consultant", testified.

Haje's firm obtains permits for people who wish to install docks or bulkheads, or do dredging or similar work. He testified that it would be unlikely that the Southampton Trustees would grant a building permit for the construction of a dock within the Quogue Canal abutting the petitioner's property. In a similar vein, Stanton J. Pohl, an attorney, concluded that it would be "highly unlikely" that the Zoning Board of Appeals of the Village of Quogue would grant a variance for the construction of a dock. In essence, to grant a variance for a dock on a parcel where there is no residence would be to permit a commercial activity in a residential zone. Pohl explained that the Zoning Board would be reluctant to do this.

Testifying for the respondent on this issue was Richard E. DePetris, an attorney who had represented the Zoning Board of Appeals of the Village of Quogue in connection with a variance application that the petitioner had made with respect to the construction of the proposed residence, which was subsequently withdrawn.

DePetris indicated that there was a strong possibility that the variances required for the off-street parking and the catwalk would be granted. He also indicated that the variance necessary for the dock would also be granted. DePetris explained that the denial of the wetlands permit was a "significant factor to be considered" in this regard, because

"One of the criteria to be considered under established case law and statutory law on a use variance is whether a reasonable return can be made from any permitted use. So if a property is eligible for erection of a one-family dwelling * * * it would be very difficult for an applicant to be able to prove that he can't make a reasonable return from a permitted use * * * therefore, it is only an unusual fact situation * * * that the Board would ever seriously consider such an application.

"Q. And in your opinion, the denial of the DEC Permit for the construction of a dwelling and sanitary system could constitute such an unusual circumstance, is that your opinion?

"A. That is correct * * * if the applicant cannot erect a one-family dwelling on his lot, that is a relevant factor in showing whether or not the applicant can make a reasonable return from the permitted use, one family dwelling".

## C

The petitioner also testified at the hearing, stating that he paid $100,000 cash for the property. Of this, $90,000 was earmarked to discharge an I.R.S. tax lien of the prior owner.

The petitioner is an attorney who owns 50 rental properties, as well as commercial, industrial, and office buildings. He has extensive experience constructing houses in the Quogue/ Southampton area.

The petitioner acknowledged that since 1990, each year he has successfully petitioned the Village of Quogue and the Town of Southampton for a reduction in the real estate taxes on the subject parcel. The basis for his applications is that his property "had wetlands on it and that should be taken into consideration in the taxing of this property".

He also acknowledged that, at the time of his purchase, he was aware that the bulk of the subject parcel had been inventoried as tidal wetlands. He was also aware that there had been prior litigation involving the subject parcel.

## D

The Supreme Court denied the petition and dismissed the proceeding *(see, Matter of Gazza v New York State Dept. of Envtl. Conservation,* 159 Misc 2d 591).

The court essentially relied on two grounds for its decision. First, the court concluded that the denial of the building permit could not be deemed a taking because the petitioner could still utilize the property for recreational purposes. Therefore, the court reasoned, its "economic value" had not been destroyed *(supra,* at 594).

Second, the court reasoned that the petitioner, at the time he purchased the property, could not have had a reasonable investment-backed expectation that he would be able to build a house thereon. In this regard, the court observed that the petitioner " 'factored' in" the inherent limitations on the property when making his offer to purchase it *(supra,* at 595). As the court stated:

"Gazza acquired a 'bundle of rights' when he purchased the Quogue property, but he also acquired a bundle of limitations. Those included the Tidal Wetlands Act.

"Petitioner seeks to translate his ' "unilateral expectation or * * * abstract need" ' into a ' "reasonable investment-backed expectation".' *(Ruckelshaus v Monsanto Co.,* 467 US 986, 1005.) Since he was on notice of the preexisting limitations on the

property, and that those limitations advance a legitimate State interest, he cannot claim a taking *(supra,* at 1007)" *(Matter of Gazza v New York State Dept. of Envtl. Conservation,* 159 Misc 2d 591, 595, *supra).*

## III

### A

In this proceeding, the petitioner has not asserted that the denial of his building permit by the respondent was not supported by substantial evidence. Rather, the petitioner asserts that the denial of a building permit constituted a regulatory taking of his property for which he should be compensated.

The operative statute is ECL 25-0404, which provides as follows:

"Judicial Review.

"Any person aggrieved by the issuance, denial, suspension, or revocation of a permit may within thirty days from the date of the commissioner's order seek judicial review pursuant to article seventy-eight of the civil practice law and rules in the supreme court for the county in which the tidal wetlands affected are located. In the event that the court may find that the determination of the commissioner constitutes the equivalent of a taking without compensation, and the land so regulated otherwise meets the interest and objectives of this act, it may, at the election of the commissioner, either set aside the order or require the commissioner to acquire the tidal wetlands or such rights in them as have been taken, proceeding under the power of eminent domain."

In *de St. Aubin v Flacke* (68 NY2d 66, 70, 76) the Court of Appeals made the following observations concerning the issue of a regulatory taking under ECL 25-0404:

"Since wetlands restrictions are far more stringent than most other regulations—restricting development per se—the Legislature has provided property owners with a unique remedy against an unconstitutional taking within the context of the regulatory scheme itself. Thus, if a permit [for wetlands development] is denied or the permit offered is more limited in scope than that sought, the owner may seek judicial review of the administrative denial in a two-step proceeding. If the court finds that the permit denial is supported by substantial evidence, then a second determination is made in the same proceeding to determine whether the restriction constitutes an

unconstitutional taking requiring compensation. The taking determination is made on the basis of a full evidentiary hearing and if the landowner prevails the Commissioner is directed, at his option, to either grant the requested permit or institute condemnation proceedings (ECL 25-0404 [citation omitted]) * * *

"A landowner who claims that land regulation has effected a taking of his property bears *the heavy burden* of overcoming the presumption of constitutionality that attaches to the regulation and of proving every element of his claim *beyond a reasonable doubt* * * * That burden remains upon him throughout the case and never shifts to the State. Only when the landowner establishes a prima facie case by presenting evidence of sufficient 'quality and weight' to permit the trier of fact to decide in his favor does the State have any burden at all and then it has only a practical burden of going forward with evidence in rebuttal or risk an adverse determination by the trier of fact rather than a legal obligation that is essential to avoiding judgment as a matter of law" (emphasis supplied).

In *Spears v Berle* (48 NY2d 254, 263), an earlier case involving the Freshwater Wetlands Act, the Court of Appeals made clear that " 'dollars and cents' " specifics be shown to justify a claim of a regulatory taking. In this regard, the Court stated as follows: "a land use regulation * * * is deemed too onerous when it 'renders the property unsuitable for any reasonable income[,] productive or other private use for which it is adapted and thus destroys its economic value, or all but a bare residue of its value' * * * Only when the evidence shows that the economic value, or all but a bare residue of the value, of the parcel has been destroyed has a 'taking' been established" *(Spears v Berle, supra,* at 262-263).

## B

Central to this appeal is the fact that at the time he purchased the property, the petitioner knew of the wetland regulations that "burdened" it. Nevertheless, the petitioner claims that he was not bound by this knowledge. Rather, he asserts that up until the building permit was denied by the respondent, there was always the possibility that he would be able to construct a residence on the parcel. Accordingly, he argues, it was not until that denial that he was made to suffer a regulatory taking which diminished the value of his property from $396,000 (its value as a buildable lot) to nothing.

We observe that the petitioner's claim that, during his tenure of ownership, his property was worth $396,000 is belied by

the $100,000 purchase price he paid for the property. As the Court of Appeals has noted, a recent sale of a subject parcel is generally the "best evidence" of the parcel's value *(Matter of Allied Corp. v Town of Camillus,* 80 NY2d 351, 356). In the instant case, we have such a recent sale that reflects the "unbuildable" nature of the subject parcel. In other words, how can the petitioner reasonably claim that he expected to build a house on the subject lot, and that his reasonable expectations were frustrated by the respondent, when his own purchase price reflects a diminished value for the parcel?

This interplay between a property owner's reasonable expectations and the impact of governmental regulation on property has been considered in cases of the United States Supreme Court. At this juncture, an examination of two of those cases is in order.

The first, *Lucas v South Carolina Coastal Council* (505 US 1003) involved two beachfront lots in South Carolina, purchased in 1986. At the time of the purchase, there were no environmental restrictions on the property. In 1988, the State Legislature enacted the Beachfront Management Act which barred the petitioner from building any permanent habitable structure on his lots.

The petitioner in *Lucas* sought compensation for a regulatory taking. The Supreme Court (Scalia, J.) noted the well-established rule that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking" *(Lucas v South Carolina Coastal Council, supra,* at 1019 [emphasis in the original]). The Court formulated the following rule: "Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that *the proscribed use interests were not part of his title to begin with.* This accords, we think, with our 'takings' jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property" *(Lucas v South Carolina Coastal Council, supra,* at 1027 [emphasis supplied]).

In *Lucas,* the Court remitted the case for a determination as to whether "common-law principles would have prevented the erection of any habitable or productive improvements on

petitioner's land" *(Lucas v South Carolina Coastal Council, supra,* at 1031). However, as it pertains to the instant appeal, *Lucas* stands for the principle that the State must compensate a landowner for imposing certain comprehensive environmental restrictions provided "the proscribed use interests were not part of his title to begin with" *(Lucas v South Carolina Coastal Council, supra,* at 1027). This limitation is clarified in the concurring opinion by Justice Kennedy, which states as follows: "The finding of no value must be considered under the Takings Clause by reference to the owner's *reasonable, investment-backed expectations * * * Where a taking is alleged from regulations which deprive the property of all value, the test must be whether the deprivation is contrary to reasonable, investment-backed expectations" *(Lucas v South Carolina Coastal Council, supra,* at 1034 [Kennedy, J., concurring; emphasis supplied]).

The concept of "reasonable investment-backed expectations" was extensively discussed in the earlier case of *Ruckelshaus v Monsanto Co.* (467 US 986, *supra).*

*Ruckelshaus* involved the Federal Insecticide, Fungicide, and Rodenticide Act (hereinafter FIFRA), which generally requires companies that desire to market a pesticide to submit the formula for the pesticide to the Environmental Protection Agency (hereinafter the EPA). The EPA then issues a registration for the pesticide. At issue was the fact that the formula that is submitted many times contains trade secrets that have been developed by the applicant at considerable time and expense. FIFRA, as amended in 1978, gave an applicant only 10 years of exclusive use of any "trade secrets" that are submitted in support of an application to register a pesticide.

In essence, then, FIFRA provides that, in order to market a pesticide (i.e., by obtaining a registration from the EPA), a company must, to some degree, give up its trade secrets to its competitors. The appellee in *Ruckelshaus,* the Monsanto Company, argued that this scheme constituted a "taking" of its property and, therefore, it was entitled to compensation under the Takings Clause of the United States Constitution.

The Supreme Court, in a 7 to 1 decision (O'Connor, J., dissenting in part), rejected this argument. In part, the Court noted as follows:

"A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.' * * * We find that with respect to any health, safety, and environmental data that Monsanto submitted to EPA after the effective date

of the 1978 FIFRA amendments * * * Monsanto could not have had a reasonable, investment backed expectation that EPA would keep the data confidential beyond the limits prescribed in the amended statute itself. Monsanto was on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration.

"Thus, with respect to any data submitted to EPA on or after October 1, 1978, Monsanto knew that, for a period of 10 years from the date of submission, EPA would not consider those data in evaluating the application of another without Monsanto's permission * * *. It was also aware, however, that once the 10-year period had expired, EPA could use the data without Monsanto's permission * * * If, despite the * * * data-disclosure provisions in the statute, Monsanto chose to submit the requisite data in order to receive a registration, it can hardly argue that its reasonable investment-backed expectations are disturbed when EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission" (Ruckelshaus v Monsanto Co., supra, at 1005-1007, 1013).

## IV

Applying these principles to the instant case, we conclude that a reasonable purchaser in the petitioner's position would not have expected to have the unfettered use of the subject parcel. In other words, at the time the petitioner purchased the parcel, it would have been unreasonable for him to assume that he was purchasing its "full unrestricted residential value" (Chase Manhattan Bank v State of New York, 103 AD2d 211, 219). Therefore, the Supreme Court's conclusion that a "taking" did not occur upon the denial of a building permit by the respondent should not be disturbed.

The petitioner, however, argues that, as a result of the respondent's determination, he will be unable to use his property for any purpose, including recreational pursuits. Accordingly, he asserts, he has been deprived of all but a bare residue of the parcel's economic value (see, Spears v Berle, 48 NY2d 254, 262, supra).

This assertion is without merit. The respondent presented ample and convincing evidence that, in the words of one of its consultants, "an unusual fact situation" existed that would lead the local authorities to grant the appropriate variances and permits so as to allow the construction of a dock and

catwalk on the parcel. It was the petitioner's burden to prove that he would be unable to use his parcel for recreational purposes because the appropriate permits and variances would not be granted by the local authorities. Our review of the record sustains a finding that the petitioner did not meet this burden. We note that the petitioner apparently withdrew his variance application prior to a decision of the Village Zoning Board. The Court of Appeals has observed that "It may be that the best way for the landowner to meet this burden of proof is to establish that he sought a variance in good faith but was unsuccessful" *(de St. Aubin v Flacke,* 68 NY2d 66, 78-79, *supra).* Although there is no requirement that the landowner take this procedural route *(see, de St. Aubin v Flacke, supra),* the withdrawal of the variance application in the instant case is a probative fact militating against the petitioner's claimed inability to utilize his property for any purpose.

Thus, under the circumstances of this case, we cannot say that the Supreme Court erred when it determined that "the economic value of [the] land" had not been destroyed and that it rather retained significant value for recreational use *(de St. Aubin v Flacke,* 68 NY2d 66, 78, *supra;* ECL 25-0404; *cf.,* CPLR 7804 [g]). We therefore conclude that the petitioner failed to meet his "heavy burden" of proving a taking "beyond a reasonable doubt" *(de St. Aubin v Flacke, supra,* at 76).

As noted, the petitioner's own purchase price of $100,000, when compared to its purported $396,000 appraised value as a buildable lot, reflects the parcel's diminished value. In other words, the very amount the petitioner paid for the property (which was remarkably close to the respondent's appraisal of $80,000) is strong proof of what his investment-backed expectations were at the time of the purchase. The petitioner, as a knowledgable buyer, adjusted his purchase price to "offset" the restrictions that he knew had been placed on the property *(Berwick v State of New York,* 107 AD2d 79, 84). Under these circumstances, to give credence to the petitioner's claim of a taking, and to grant his application for compensation, would be to afford him a windfall that the law never intended taxpayers to shoulder. Accordingly, the Supreme Court properly dismissed the proceeding, and the judgment is affirmed *(see also, Manocherian v Lenox Hill Hosp.,* 84 NY2d 385, 392-393; *Matter of Ward v Bennett,* 214 AD2d 741; *Dawson v Higgins,* 197 AD2d 127).

BRACKEN, J. P., SULLIVAN and KRAUSMAN, JJ., concur.

Ordered that the judgment is affirmed, with costs.